IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 2:05-CR-121 |
| | ) | |
| MICHAEL L. JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on the Motion to Suppress Statements, Admissions and Confessions, Request for a Hearing and Points and Authorities Thereon, filed by Michael L. Jackson on September 26, 2005. For the reasons set forth below, the motion is **DENIED**.

BACKGROUND

Defendant, Michael L. Jackson ("Jackson"), was charged in a two count indictment with distributing cocaine base, commonly known as crack, and distributing five grams or more of cocaine base, commonly known as crack. Following his arrest, Jackson signed a waiver of his *Miranda* rights, and then signed a written confession. Jackson now moves this Court to suppress the confession, arguing that both his

waiver and subsequent confession were involuntary.

The Government filed a brief in response to the instant motion on October 3, 2005. A second response was filed by the Government on April 7, 2006. This response fails to acknowledge that a response was previously filed. After Jackson filed a motion to continue the suppression hearing, which provided further insight into his theory, this Court ordered further briefing by the parties. Jackson filed a supplemental brief on April 21, 2006. The Court held the first part of an evidentiary hearing on this matter on May 3, 2006, at which Officer James Jefferson Soper ("Soper") and Agent Mark Becker ("Becker") testified for the Government, and Dr. Gary Michael Durak ("Dr. Durak") testified for the defense. The hearing resumed on May 15, 2006, at which time additional testimony was heard from Dr. Durak and the Court heard argument from both the Government and Jackson. At the conclusion of the hearing, the Court took the motion under advisement. In making the following findings of fact, the Court considered the evidence presented and the credibility of the witnesses.


FINDINGS OF FACT

Jackson was the subject of a federal investigation in which he was believed to have sold narcotics, specifically crack cocaine, to a confidential informant on two occasions. Soper was involved in this investigation, and monitored telephone calls between the confidential

informant and Jackson.  In the controlled buys, it is alleged that Jackson "fronted" the drugs to the confidential informant, meaning that he provided the drugs without payment and was paid later, after the drugs had been sold yet again.

Jackson was arrested on August 19, 2005, pursuant to a federal arrest warrant.  Jackson was spotted by surveillance exiting a vehicle in the vicinity of what was thought to be his residence.  He was approached by six to ten officers, and it is unknown whether the officers had guns drawn at the time.  Soper handcuffed Jackson, and told him that he was under arrest pursuant to a federal arrest warrant for dealing crack cocaine.

Soper transported him to the Gang Response Investigative Team ("GRIT") office in Gary, Indiana.   While transporting him, Soper again explained that he was being arrested pursuant to a federal arrest warrant.  Jackson arrived at GRIT's office at 1:34 p.m.  Upon arrival, Jackson was taken to an interview room for processing.  His picture was taken, and he was asked routine booking questions, such as his name, date of birth, social security number, telephone number, and place of employment.   During this time, Jackson responded appropriately to Soper's questioning.

Soper advised Jackson of his *Miranda* rights.  This was done using an "Advice of Rights" form routinely used for this purpose.  The form was placed in front of Jackson, and Soper then read the form out loud. Soper began reading the form at 1:58 p.m.  The form reads as follows:

-3-

> Before we ask you any questions, you must
> understand your rights.
> You have the right to remain silent.
> Anything you say can be used against you in
> court.
> You have the right to talk to a lawyer for advice
> before we ask you any questions
> You have the right to have a lawyer with you
> during questioning.
> If you cannot afford a lawyer, one will be
> appointed for you before any questioning if you
> wish.
> If you decide to answer questions now without a
> lawyer present, you have the right to stop
> answering at any time.

(Gov. Ex. 1.)

Additionally, the form provides a waiver provision as follows:
"I have read this statement of my rights and I understand what my
rights are.  At this time, I am willing to answer questions without
a lawyer present."  (Gov. Ex. 1.)

Soper then asked Jackson if he understood the statement, to
initial it, and Jackson was provided with an opportunity to read the
form to himself.  Soper did not observe anything that would indicate
that Jackson did not understand his rights, as explained by the form.
Soper did nothing to put pressure on Jackson to waive his rights, and
did not observe anyone else putting pressure on Jackson to waive his
rights.  No promises were made to Jackson.  No physical force was
used, and there was no threat of physical force.  During this time,
Jackson appeared to understand what Soper was saying to him.

Jackson placed his initials to the left of each statement of his
rights, and printed his name at the bottom of the form.  His signature

-4-

was witnessed by Soper and William Nozer ("Nozer"), who was also present when Jackson's rights were reviewed, at 2:03 p.m. on August 19, 2005.

Following the waiver of rights, Jackson spoke with Officers Soper and Nozer. He denied any involvement in selling crack. Soper and Nozer spoke with him about working as a cooperative individual, and indicated that if he did so he might avoid going to jail that day. Nothing was promised. Jackson was simply told that if he cooperated they would let the U.S. Attorney know of the cooperation and put in a good word for him. Although Jackson offered to assist in finding someone who did sell drugs, he insisted that he had never sold drugs.

Soper was not aware that Jackson had any intellectual deficiencies. While Soper does recall that Jackson said he received social security benefits due to back problems and a learning disability, Soper did nothing to take advantage of a potential learning disability, and did not observe anyone else attempt to take advantage of Jackson's alleged learning disability. While the confidential informant utilized in this case may have known that Jackson was in special education courses and was mentally retarded, Soper was unaware of this on August 19, 2005.

When Soper and Nozer finished interviewing Jackson, Supervisory Special Agent Mark Becker interviewed him. Becker was one of the officers present when Jackson was arrested. Becker has attended numerous interview schools, and conducted thousands of interviews.

-5-

And, although Soper and Nozer were not successful, Becker thought he might be able to get Jackson to talk.

Becker, unlike Soper and Nozer, was successful in gaining valuable information from Jackson.   Becker spent less than an hour talking with Jackson.   Becker was not armed during the interview.   He did not yell.   And, he made only one promise: that everything would be relayed to the U.S. Attorney and that nobody can make promises. He placed no physical or mental pressure on him.

During the interview, Becker never got the sense that Jackson was not following or understanding him.   Becker does not recall having any knowledge that Jackson had a learning disability, and nothing made Becker think that Jackson had a learning disability.

As is Becker's technique, he did not give Jackson a chance to repeat lies to him.   Becker basically told Jackson that they were not going to discuss whether Jackson was a drug dealer - because that was already known - and that Becker wanted to know who he bought drugs from.   Essentially, Becker told Jackson that he was guilty.   Jackson confessed that he had sold crack on three prior occasions.   Upon further prodding, Jackson said that he had perhaps sold crack four times.   He indicated that the largest amount of crack he had sold was 6.2 grams, and that he had purchased 7 grams.   But, Jackson contended that he could not provide names of any individuals he had purchased crack from.   Becker advised Jackson of the seriousness of the offense, and the fact that he was facing jail time.   Becker  explained that he

would go before a magistrate and that the magistrate would determine bond.  He never suggested that cooperation would be linked to bond.

Becker wrote out a statement memorializing Jackson's confession, as is his practice.  He then read it aloud to Jackson and invited Jackson to read along quietly.  Jackson indicated to Becker that he could read and write English.  Jackson signed the statement at approximately 3:15 p.m. on August 19, 2005, within one hour and 15 minutes of his signing the waiving of his rights.  It provides the following:

> I worked full time for 4 to 5 years at an auto sales lot and I quit in January 2005.  Prior to that, I had never sold any illegal drugs at all. Since then, I think I may have sold crack cocaine on 3 or 4 times.  I was just helping somebody out.  Mr. Becker asked me for the names of the people I sold the drugs to.  I told him that I could not remember their names.  I was asked for the names of the people I bought drugs from.  I do not know their names.  I told Mr. Becker that I never made any money from selling crack cocaine.  I sold the cocaine for whatever it cost me.  I am sorry that I sold crack cocaine.  I only did it to help these people out who I thought were my friends.

(Def.'s Ex. D.)

The undisputed evidence is that Jackson is mildly to moderately mentally retarded.  Jackson spent his educational career in special education.  (Def.'s Ex. B at 7; Def.'s Ex. E at 4.)  The results of a comprehensive test of basic skills administered to Jackson when he was in the eleventh grade reveals that he scored higher than only 1% of eleventh grade students in reading and math, and that his language

skills were almost as poor.  (Def.'s Ex. C.)  Dr. Durak, a licensed clinical psychologist in Indiana, performed extensive psychological testing on Jackson on more than one occasion, and issued two detailed reports of his findings.  The first report, dated September 28, 2005, finds that Jackson has a Full Scale IQ of 49, which places his overall level of intellectual functioning in the extremely low range and at less than the first percentile.  (Def's Ex. F at 2.)  Dr. Durak concluded that Jackson meets criteria for the diagnosis of mild mental retardation, that his reading ability, comprehension and math reasoning scores place him within or below the first grade level, and that Jackson has significantly impaired memory abilities commensurate with his extremely low IQ.  (Def's Ex. F at 4.)

Following Dr. Durak's evaluation of Jackson, Jackson's competency to stand trial was evaluated by the Federal Bureau of Prisons.  (Def's Ex. E.)  This evaluator found Jackson's full scale IQ to be 50.  (*Id*. at 7.)  And, it was concluded that Jackson was competent to stand trial.  (*Id*. at 12.)  The determination that Jackson is fit to stand trial was not contested by Jackson.

Dr. Durak also issued a Forensic Psychological Evaluation dated May 1, 2006.  (Def.'s Ex. B.)  During this evaluation, Jackson reported to Dr. Durak that he felt scared when arrested.  Jackson claims that he was given a paper and told that he didn't have to sign it, but that if he wanted a bond, he had to sign it.  Jackson also claims that the officers told him that he could only get four years

for the crime, and implied that he would not see his daughter. (*Id.* at 16). Jackson further claimed that his rights were not given to him. (*Id.*) Jackson also stated: "I don't recall them giving me no rights . . . told to sign the piece of paper so I can get a bond . . . told me I was being arrested for distributing crack." (*Id.* at 17.) Other than the statements contained in this report, there is no evidence to corroborate these claims. This Court finds these statements by Jackson less than credible.

Dr. Durak's May 1, 2006, exam was designed specifically to test whether Jackson understood his Miranda rights sufficiently that he could knowingly and voluntarily waive them. Dr. Durak asked Jackson a series of questions regarding his understanding of his *Miranda* rights. When asked what rights he should have been provided, he stated "supposed to tell you have a right to remain silent, a right to be quiet, a right to an attorney, if you want, if you can't afford one, attorney, we will appoint one to you . . . They didn't say this. They told me to sign this so I could go to the magistrate and get a bond . . . ." (*Id.* at 16.) When asked to name his rights, Jackson stated: "I don't really know right. You have a right to remain silent. You have a right to an attorney. You got a right to remain silent." (*Id.*)

Jackson was able to offer the following paraphrases to Dr. Durak of the statements of rights contained in the Advice of Rights form that he initialed and signed.

Regarding the meaning of the statement, "Before we ask you any questions, you must understand your rights," he said, **"I don't know . . . do you understand what we are charging you with?"** Regarding the meaning of the statement, "You have the right to remain silent," he said, **"I don't know, I guess quiet."** Regarding the statement, "Anything you say can be used against you in court", he stated, **"Whatever I say on the piece of paper, they can bring it up in court."** Regarding the statement, "You have a right to talk to a lawyer for advice before we ask you any questions," he stated, **"I could talk to a lawyer before I could talk to them."** Regarding the statement, "You have a right to have a lawyer with you during questioning", he stated, **"I had no lawyer so I went to sign it to get the process going ... to have a lawyer with me as I talk to you."** Regarding the statement, "If you can not afford a lawyer, one will be appointed for you before any questions, if you wish", he stated, **"If I can't afford one, they will give me one ... I thought I could get a bond to get out of jail."** Regarding the statement, "If you decide to answer questions now, without a lawyer present, you have a right to stop answering at any time," he stated, **"I can talk to them, but if I don't have a lawyer, I can just stop ... I did then.  They asked me a couple of questions, I just stopped because I felt to stop ... not because I read that."**

Regarding the sentence stating, "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present," he stated, **"Saying I am going to answer the questions without a lawyer present, but I had no lawyer . . . thought if I signed the paper, I would get a bond ... but he took me to Gary Police Department and locked me up."**

(Def.'s Ex. B at 17.)

Jackson consistently stated to Dr. Durak that he was under the

impression that, if he signed the papers, meaning the Advice of Rights and the Statement, he would get bonded out and be able to go home. (Def.'s Ex. B at 17.)

One of the tests that Dr. Durak administered is called the Function of Rights and Interrogation Instrument ("FRI"), which is one of the Grisso Instruments for Assessing Understanding Appreciation of *Miranda* Rights.  The FRI, a structured interview using four hypothesize situations, is a projective tool designed to assess an individual's current understanding of the interrogation process. (Id.)  Dr. Durak indicates that:

> Mr. Jackson's FRI scores indicated he is currently not able, nor has he "learned" to comprehend the function of the right to be silent, its consequences and purpose in the interrogation or courtroom setting.  It is likely, at the time of his arrest, given all variables, Mr. Jackson did not understand his right to be silent or the nature of the interrogation.  He showed a limited understanding of his right to counsel but not sufficient enough to appreciate the long range consequences of his choice.

(Def.'s Ex. B at 18.)

Jackson reads at approximately the first grade reading level. The *Miranda* warnings that Jackson was given consist of numerous statements that, according to Dr. Durak's analysis, require a  much higher reading level.  At the hearing on the motion to suppress, Dr. Durak testified that based on his test results and his reading and comprehension ability, he believes that by merely reading *Miranda* warnings to Jackson, they had no real meaning to him.  Based on other

evidence to the contrary contained in Dr. Durak's report (namely, Jackson's paraphrases of the statements contained in the Advice of Rights form), this finding by Dr. Durak is rejected.

Dr. Durak testified that, as someone with a low IQ, Jackson is more susceptible to suggestion than other individuals.  However, it is clear from the testimony of Becker that Jackson was not merely parroting back answers that were suggested to him.  While Jackson claimed that the largest amount of crack he had sold was 6.2 grams (the largest of the amounts sold during the two controlled buys), Jackson also stated to Becker that the largest amount of crack he had purchased was 7 grams.  This amount was never suggested to Jackson by Becker.

The evidence before this Court shows that Jackson held a job for several years, although it is not entirely clear what the nature of the job was.  There is at least some evidence to suggest that the job may not have been a full time job, but rather a part time job working for relatively small amounts of cash.  Jackson's mother told Dr. Durak that at most Jackson might come home with $50.  According to his mother, Jackson's "job" consisted of riding around in a tow truck with his friend that owned a business and doing odd jobs in exchange for a few dollars.  For purposes of this motion, Jackson's mother's description of his employment is accepted as true.

The record also establishes that Jackson has been arrested numerous times in the past.  His previous arrests include an arrest

-12-

for possession of a controlled substance, resisting law enforcement, kidnaping, driving while suspended, and leaving the scene of an unattended vehicle.  (Def.'s Ex. B at 3.)


CONCLUSIONS OF LAW

In my 18 years on the bench, I have never been presented with a motion to suppress quite like this one.  Defendant argues that, due to his mental retardation, his waiver of rights and his confession were involuntary, and that any statements, admissions or confessions of Jackson must be suppressed pursuant to the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1965).[1]  While this argument shows vigorous advocacy on the part of defense counsel, it must ultimately fail under existing law.

The Fifth Amendment of the United States Constitution guarantees that no person "be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ."  U.S. CONST. AMEND. V.  The Fifth Amendment "[p]rotects a person only against being incriminated by his own compelled testimonial communications." *Doe v. U.S.*, 487 U.S. 201, 207 (1988).  When an individual is taken into custody and is subject

---

[1]Defendant initially indicated that the manner in which his waiver and confession were obtained violated the Sixth Amendment as well.  But, Defendant conceded in his supplemental brief submitted on April 21, 2006 that the Sixth Amendment is not applicable here.  (Def.'s Supplemental Brief, at 3, n.2.)

to interrogation, the individual must be advised of their Fifth Amendment rights. *Miranda v. Arizona*, 384 U.S. 436 (1966).

*Miranda* provides that statements obtained through custodial interrogation can not be utilized at trial unless the use of procedural safeguards guarantees that the accused has been informed of and has freely waived the Constitutional privileges of the Fifth Amendment. *Miranda*, 384 U.S. at 444-45. The burden rests with the Government to demonstrate that a defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Id.* at 475. Likewise, the Government has the burden of establishing the voluntariness of any statement it intends to use at trial. *See United States v. Holmes*, 632 F.2d 167 (1st Cir. 1980); *United States v. Dodier*, 630 F.2d 232 (4th Cir. 1980); *United States v. Cox,* 487 F.2d 634 (5th Cir. 1973).

In *Moran v. Burbine*, the Supreme Court addressed what constitutes a valid waiver of *Miranda* rights. 475 U.S. 412 (1986). According to the Court in *Burbine*, this inquiry has two distinct dimensions.

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

-14-

*Id.* at 422 (internal quotations omitted).

But, later the same year, the Supreme Court decided another case addressing waiver of *Miranda* rights and voluntariness of confessions. In *Colorado v. Connelly*, the Supreme Court decided whether a mentally ill individual suffering from psychosis at the time of his confession validly waived his *Miranda* rights and whether his confession was admissible at trial. *Colorado v. Connelly*, 479 U.S. 157 (1986). In *Connelly*, the defendant's cognitive abilities were not impaired by his illness, and he understood his rights. *Id.* at 161-62. With regards to the admissibility of confessions, the Supreme Court stated the following:

> . . . [C]oercive government misconduct was the catalyst for this Court's seminal confession case, *Brown v. Mississippi*, 297 U.S. 278, 56 S. Ct. 461, 80 L. Ed 682 (1936). In that case, police officers extracted confessions from the accused through brutal torture. The Court had little difficulty concluding that even though the Fifth Amendment did not at that time apply to the States, the actions of the police were "revolting to the sense of justice." *Id.,* at 286, 56 S. Ct., at 465. The Court has retained this due process focus, even after holding, in *Malloy v. Hogan,* 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed.2d 653 (1964), that the Fifth Amendment privilege against compulsory self-incrimination applies to the States. See *Miller v. Fenton, supra,* 474 U.S., at 109-110, 106 S. Ct., at 449.
>
> Thus, the cases considered by this Court over the 50 years since *Brown v. Mississippi* have focused upon the crucial element of police overreaching. While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct. Absent police conduct causally related to the

-15-

> confession, there is simply no basis for
> concluding that any state actor has deprived a
> criminal defendant of due process of law.
> Respondent correctly notes that as interrogators
> have turned to more subtle forms of psychological
> persuasion, courts have found the mental
> condition of the defendant a more significant
> factor in the "voluntariness" calculus.   See
> *Spano v. New York*, 360 U.S. 315, 79 S. Ct. 1202,
> 3 L. Ed.2d 1265 (1959).  But this fact does not
> justify a conclusion that a defendant's mental
> condition, by itself and apart from its relation
> to official coercion, should ever dispose of the
> inquiry into constitutional "voluntariness."

*Id.* at 163-64.

The Court in *Connelly* did not merely address the admissibility of confessions; the Court also addressed the issue of waiver of *Miranda* rights which had just been addressed early that year in *Moran v. Burbine*.   In *Connelly*, the Supreme Court of Colorado had relied upon the testimony of a psychologist that the respondent could not make a "free decision with respect to his constitutional right of silence ... and his constitutional right to confer with a lawyer before talking to the police."  *Id.* at 169.  But, the Court had this to say about reliance on such testimony:

> We think that the Supreme Court of Colorado erred
> in importing into this area of constitutional law
> notions of "free will" that have no place there.
> There is obviously no reason to require more in
> the way of a "voluntariness" inquiry in the
> *Miranda* waiver context than in the Fourteenth
> Amendment confession context.  The sole concern
> of the Fifth Amendment, on which *Miranda* was
> based, is governmental coercion . . .
>
> Respondent urges this Court to adopt his "free
> will" rationale, and to find an attempted waiver
> invalid whenever the defendant feels compelled to

> waive his rights by reason of any compulsion,
> even if the compulsion does not flow from the
> police.  But such a treatment of the waiver issue
> would "cut this Court's holding in [*Miranda*]
> completely loose from its own explicitly stated
> rationale."  *Beckwith v. United States,* 425 U.S.
> 341, 345, 96 S. Ct. 1612, 1615, 48 L. Ed.2d 1
> (1976).  *Miranda* protects defendants against
> government coercion leading them to surrender
> rights protected by the Fifth Amendment; it goes
> no further than that.

*Id.* at 170-71.  Similarly, the Seventh Circuit, relying on *Connelly*,
has stated that "It is well established that mental state alone cannot
render a confession involuntary; government coercion must also be a
factor."  *United States v. Jones*, 359 F.3d 921 (7th Cir. 2004).
Likewise, in *United States v. Chrismon* the Seventh Circuit recognized
that  "A diminished mental state is only relevant to the voluntariness
inquiry if it made mental or physical coercion by the police more
effective."  965 F.2d 1465, 1469 (7th Cir. 1992).

Although neither party brought the case to this Court's
attention, the Seventh Circuit has ruled on a case factually similar
to the instant case. *Young v. Walls*, 311 F.3d 846 (7th Cir. 2002).
In *Young*, the Seventh Circuit considered whether the confession of an
individual with an IQ of 56 who demonstrated "slight comprehension of
abstract concepts" was admissible.  *Id.* at 847-48.  Young argued that
his confession could not be effective because he could not understand
the legal significance of *Miranda* warnings.  In considering whether
his confession should be suppressed, the Court first looked at the
fact that he had not argued that he was unfit for trial, and that

there was a judicial conclusion that he was fit for trial.  The Court found that this undercut his argument that the confession should be suppressed.  In so holding, the Court relied upon *Godinez v. Moran*, 509 U.S. 389 (1993).  In *Godinez*, the Supreme Court held that a defendant competent to stand trial, and thus to waive or exercise rights at trial, is competent to waive the right to counsel.  Based on *Godinez*, the Seventh Circuit held that "Because a waiver of rights under *Miranda v. Arizona* . . . is just a species of counsel waiver, a defendant competent to stand trial must be competent to confess." *Id.* at 849.

But, the Seventh Circuit's opinion in *Young* did not rest on *Godinez* alone.  The Court in *Young* also noted that the Supreme Court has never held "that retarded suspects are unable to waive their right to counsel or incapable of giving voluntary confessions."  *Id.*   The trial court in *Young* found that the defendant did understand the *Miranda* warnings.  In *Young,* the police bent over backwards to explain the *Miranda* warnings in detail.   With regards to Young's specific abilities, the Seventh Circuit's opinion reports the following:

> Young cannot count backward.  He does not know which direction is "east" and thus cannot tell where the sun appears.  Asked to name the Presidents since 1950, he answered "Washington" and "Lincoln."  He knows that winter means cold and snow but cannot explain what "seasons" are. He cannot describe a ship(which of course he does not encounter in daily life).  His command of analogies and categories is poor; he can't explain in what respects a dog is similar to a lion. But he knows that a "PD" in Illinois is a public defender, and he knows what a trial is for

> even though he cannot describe how the jury
> works. In other words, he has concrete knowledge
> suited to his occupation as a career criminal,
> but poor verbal skills, a low fund of general
> knowledge, and an inability to reason (or talk)
> abstractly.

After summarizing Young's weaknesses, the Seventh Circuit asked:

> Do these deficiencies mean that a person such as
> Young is unable to confess to a crime? If
> entitlement to talk to the police depends on
> capacity to reason abstractly about the legal
> system and understand the long-term consequences
> of one's acts (such as the effect that a
> confession will have at trial), then the answer
> must be yes. See Morgan Cloud, George B.
> Shepherd, Alison Nodvid Barkoff & Justin V. Shur,
> *Words Without Meaning: The Constitution,
> Confessions, and Mentally Retarded Suspects*, 69
> U. Chi. L. Rev. 495 (2002)(concluding that
> retarded suspects do not understand the legal
> significance of *Miranda* warnings or the
> consequences of confessions). Yet *Miranda* is not
> about abstract understanding, nor does the
> Constitution protect suspects against confessions
> that are made for reasons other than official
> coercion. See *Colorado v. Connelly*, 479 U.S.
> 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986)(a
> confession given by a suspect who believed that
> God had instructed him to confess, and who
> therefore did not care about the legal system's
> agents such as lawyers, is nonetheless
> admissible). Recall the point of the warnings:
> to protect the suspect's privilege against
> compulsory self-incrimination.

*Id.* at 850. According to the Seventh Circuit, "Young had enough

awareness (the state court found) to understand what a lawyer is and

his entitlement to direct the police to stop asking questions. This

is all the fifth amendment demands." *Id.* at 850 (quoting *Moran v.

Burbine*, 475 U.S. 412 (1986)). The Seventh Circuit further stated:

> That Young may have been unable to understand why

a lawyer's assistance might be important, as one
of the psychiatrists concluded, is not legally
material.   Suspects need not know how legal
skills could be employed to best advantage.
That's asking too much and is too far removed
from the goal that *Miranda* warnings are designed
to implement.   It is sufficient if the suspect
has enough mental capacity to make decisions in
daily life.

*Id.*

Whether Jackson's waiver of his *Miranda* rights or the voluntariness of his confession is considered, this Court is to use a totalities of the circumstances test.  *See Connor v. McBride*, 375 F.3d 643, 650 (7th Cir. 2004)("In evaluating the voluntariness of a waiver or confession, a court must consider the totality of the circumstances."); *Sweeney v. Carter*, 361 F.3d 327, 331 (7th Cir. 2004)(noting that the question of whether a defendant knowingly and voluntarily waived his *Miranda* rights is evaluated in light of the totality of the circumstances); *United States v. Dillon*, 150 F.3d 754, 756 (7th Cir. 1998)("A confession is voluntary if, in light of the totality of the circumstances, the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.").

The factors to be considered include, but are not limited to, the following: defendant's age, intelligence, background, experience, mental capacity, education and physical and mental condition at the time of questioning (including whether the defendant was under the

influence of drugs or alcohol), the legality and duration of the detention, the nature of the interrogation, the duration of the questioning, and any physical or mental abuse by the police, including any threats or promises, whether suspect was informed of his rights, and defendant's prior experience with the police. *See United States v. Jones*, 359 F.3d 921, 923-24 (7th Cir. 2004); *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001); *United States v. Sablotny*, 21 F.3d 747, 750 (7th Cir. 1994). These factors are to be evaluated from the perspective of a reasonable person in the position of the suspect. *Huerta*, 239 F.3d at 871.

But, the Supreme Court has clearly held that, even under the totality of the circumstances test, Jackson must show *some* form of coercion or wrongdoing on the part of the police for his motion to suppress to be granted. *Connelly*, 479 U.S. at 167. The instant motion to suppress offered no allegations of government coercion. In fact, it appears that the hearing on the motion to suppress was used as a kind of fishing expedition, in hopes of finding some facts that could form the basis of an allegation of coercion.[2] And, at the close

---

[2]Given the cursory nature of the allegations contained in Jackson's Motion to Suppress, this Court questions whether Jackson was even entitled to a hearing.  While the Government may bear the burden of demonstrating that the waiver and confession were voluntary, "evidentiary hearings on motions to suppress are not granted as a matter of course but are held only when the defendant alleges sufficient facts which if proven would justify relief." *United States v. Coleman*, 149 F.3d 674, 677 (7th Cir. 1998).  Indeed, "[e]videntiary hearings are warranted only when the allegations and moving papers are sufficiently definite, specific, non-conjectural and detailed enough to conclude that a

of the hearing, when questioned about Jackson's claims of coercion, Jackson's attorney offered only the following contention: Becker's interrogation style (namely, telling Jackson that he knew he was guilty and wanted to know who Jackson bought drugs from) in combination with the discussion regarding going home that day if he cooperated (which was defined as admitting his guilt) was sufficient coercion under the circumstances given Jackson's low intelligence and desire to return to the safety of his home.

Jackson's argument is not enough.  There is simply no evidence of police coercion or wrongdoing in this case.  The Government has established that neither Soper nor Becker was aware of Jackson's mental retardation[3], and did not attempt to take advantage of his diminished intelligence.  The Government has established that Jackson was arrested pursuant to a federal search warrant.  Furthermore, his actual arrest was not unduly violent, and there were an appropriate number of officers present under the circumstances.  Jackson was not detained at length prior to his waiver of *Miranda* rights or his confession.  In fact, he confessed within a very brief period of time

substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion." *Id.*  Nonetheless, in the interest of caution, this Court opted to hold the hearing and rule on the merits of Jackson's claims.

[3]While Jackson hints that this claim is not believable, nothing was presented to substantiate that claim.  Some of Jackson's statements to Durak show a level of communication that is consistent with the assertions of Soper and Becker that they were unaware of Jackson's mental retardation, and this Court accepts their claims as credible.

following his arrest.  No promises were made to Jackson.  No threats of force were used.  Jackson was not deprived of food or sleep.

This was not Jackson's first arrest, and he has likely been Mirandized before, although that was not conclusively established by the record.  Jackson was accused of fronting drugs, and was sufficiently intelligent to complete two drug transactions with confidential informants.

Becker's interrogation style, while effective, was not impermissible.  Any misunderstanding by Jackson of the explanation of how bond is determined is not the fault of the officers.  Thus, in this case, there can be no finding of coercive police activity, and therefore no finding that either Jackson's waiver of his *Miranda* rights or confession was involuntary.

As with the defendant in *Young*, Jackson has "enough awareness . . . to understand what a lawyer is and his entitlement to direct the police to stop asking questions."  *See Young*, 311 F.3d at 850.  While it would have been a good idea for Soper, as the officer in *Young* did, to carefully explain each right in detail to Jackson (as such might have alleviated the need for the instant motion altogether), the Constitution does not require this.

Furthermore, Jackson's decision to waive any claims that he is not competent to stand trial cuts against his claim that his low IQ prevents him from waiving his *Miranda* rights.  *See Young*, 31 F.3d at 849.

-23-

This Court finds (considering all the evidence and the credibility of the witnesses) that, the totality of the circumstances do not show that Jackson's waiver of *Miranda* rights or his confession were involuntary.  Accordingly, Jackson's motion to suppress cannot be granted.


CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress Statements, Admissions and Confessions, Request for a Hearing and Points and Authorities Thereon is **DENIED.**


**DATED:  May 25, 2006**              **/s/RUDY LOZANO, Judge**
                                      **United States District Court**